IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CYNTHIA A. LEIGHTY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) Civil Action No. 10-1022 | |
| | ) Judge Terrence F. McVerry/ | |
| | ) Magistrate Judge Maureen Kelly | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| Defendant. | ) [ECF Nos. 11 and 17] | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

Acting pursuant to 42 U.S.C. § 405(g), Cynthia A. Leighty ("Leighty" or "the Claimant")
appeals from a final decision of the Commissioner of Social Security ("the Commissioner")
denying her application for social security disability insurance income benefits. Cross-motions
for Summary Judgment [ECF Nos. 11, 17] are pending. It is respectfully recommended that the
Claimant's Motion [ECF No. 11] be granted in part and denied in part, and that the
Commissioner's Motion [ECF No. 18] be denied.

### II. REPORT

#### A. BACKGROUND

On February 10, 2010, Leighty filed an application for disability insurance income
benefits under the Social Security Act ["the Act"], claiming an onset date of July 15, 2003.[1]
[ECF No. 6-5 at 2]. Her last date insured was June 30, 2007, meaning that "she had to establish
disability on or before that date in order to be entitled to a period of . . . benefits." [ECF No. 6-2

---

[1]Based on evidence adduced during the hearing that Leighty had last worked in December 2004, her
attorney stipulated to an onset date of January 2005. [ECF 6-2 at 44].

at 11]. The claim was administratively denied on September 13, 2006 [ECF No. 6-3 at 2]. On

October 6, 2006, Leighty requested a hearing that took place on September 11, 2007, before an

administrative law judge ("ALJ") in Morgantown, West Virginia. [ECF No. 6-4 at 9, ECF NO.

6-2 at 11]. Leighty, who was represented by counsel, and a vocational expert testified. [ECF

No. 6-2 No. at 30]. At the time of the hearing, Leighty was forty-nine years old, had an eleventh

grade education, and had earned a General Education Diploma ("GED"). She also had attended

cosmetology school, but was never licensed. Although she had worked in the past as a bartender

and a video clerk, she had never worked a full forty hour week, but had steadily worked between

ten and thirty hours per week. [ECF No. 6-2 at 40].

On October 16, 2007, the ALJ issued a decision finding that Leighty was not disabled.

[ECF No. 6-2 at 11]. Leighty's request for review was denied by the Appeals Council on

February 22, 2010, making the ALJ's opinion the final decision of the Commissioner. [Id. at 4].

This appeal followed.

### B.   STANDARD OF REVIEW

The Act limits judicial review of the Commissioner's final benefits decision to two issues:

whether the factual findings are supported by substantial evidence, Brown v. Bowen, 845 F.2d

1211, 1213 (3d Cir. 1988), and whether the correct law was applied. Coria v. Heckler, 750 F.2d

245, 247 (3d Cir. 1984). "Where the ALJ's findings of fact are supported by substantial

evidence, [the Court is] bound by those findings, even if [it] would have decided the factual

inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).

C. THE ALJ'S DECISION

In his decision, the ALJ applied the sequential five step analysis [2] articulated at 20 C.F.R.

§ 404.1520(a), and concluded at step five that Leighty was not disabled within the meaning of

the Act. At step two, the ALJ found that Leighty was not performing and had never performed

substantial gainful work. He also found that through her last date insured, Leighty had multiple

severe impairments including lumbar disc disease, chronic myofascial pain,[3] possible sinus tarsi

syndrome; gastroesophageal reflux disease, diverticulitis, depressive disorder, not otherwise

specified; and somatization disorder, not otherwise specified. [ECF No. 6-2 at 13].[4] Although

---

[2] The familiar five steps are as follows: (1) If the claimant is performing substantial gainful work, he is not disabled; (2) If the claimant is not performing substantial gainful work, his impairment(s) must be "severe" before he can be found to be disabled; (3) If the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry; (4) If the claimant's impairment (or impairments) does not prevent him from doing his past relevant work, he is not disabled; (5) Even if the claimant's impairment (or impairments) prevent him from performing his past work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

[3] This has been defined as "a chronic form of muscle pain . . . center[ing] around sensitive points in . . . muscles called trigger points." Rizzi v. Hartford Life and Accident Ins. Co., No. 09-2107, 2010 WL 2473858 at *1 n.1 (10th Cir. June 18, 2010) (quoting Mayo Clinic Staff, Definition of "Myofascial pain syndrome," Dec. 3, 2009, http:// www. mayoclinic. com/ health/ myofascial- pain- syndrome/ DS 01042 (last visited July 1, 2011). Pain may permeate the muscle affected. It "has been linked to many types of pain, including headaches, jaw pain, neck pain, low back pain, pelvic pain, and arm and leg pain." Id. See also Smith v. J.I. Case Corp., 163 F.R.D. 229, 231 (E.D.Pa.1995) (" '[M]yofascial pain syndrome' is defined as 'irritation of the muscles and fasciae (membranes) of the back and neck causing chronic pain (*without evidence of nerve or muscle disease*).'") (quoting Schmidt's Attorneys' Dictionary of Medicine M-323 (1978) (emphasis added)).

[4] The ALJ noted that Leighty, when filing her application, also alleged disability based on a pelvic injury and disc trouble, worsening back and hip pain, arterial leg disease, and had been referred to a psychiatrist for depression. At the time of her request for a hearing, she alleged that her back and hip pain had worsened, that she had been diagnosed with arterial leg disease, and had been referred to a psychiatrist for depression. She also alleged additional severe impairments including pedal edema accompanied by severe swelling in her legs, endometriosis with a large ovarian cyst, possible sinus tarsi syndrome, gastroesophageal reflux disease, sigmoid diverticulitis with chronic diverticulosis, spinal stenosis with nerve root irritation, non-transmural infarction, basilar fibrosis, bilateral erosive gastritis with duodenitis,

these impairments were deemed to be severe, the ALJ concluded that they did not, alone or in combination, meet or medically equal any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. After considering the record evidence, the ALJ found that although Leighty's medically determinable impairments could reasonably have been expected to produce the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. [Id. at 19].

The ALJ then examined Leighty's subjective account of her symptoms, against the background of the medical evidence. This review led him to conclude that Leighty retained:

> [T]he residual functional capacity to perform light work with certain modifications. She retained the ability to sit and stand at will; could perform occasional balancing, stooping, kneeling, and crouching, crawling, and climbing of ramps and stairs but could never climb ladders, ropes and scaffolds; needed to avoid exposure to workplace hazards such as dangerous moving machinery and unprotected heights; and needed to avoid concentrated exposure to vibration and temperature extremes of heat and cold. She was limited to unskilled, low stress work with no fast paced production quotas and no more than occasional contact with supervisors, co-workers, and the general public.

[Id. at 17-18].

The ALJ stated that in arriving at Leighty's residual functional capacity, he had considered all symptoms consistent with the objective medical evidence, and had evaluated the credibility of Leighty's subjective description of the intensity, persistence, or limiting effects of pain and other symptoms. [Id. at 18]. According to the ALJ, Leighty's claims of myofascial pain were not "attended by clinical findings," [id. at 15], and were belied by the "mild

---

joint dysfunction with facet syndrome, major depression, and panic attacks. [ECF No. 6-2 at 12-14]. At Step Two, the ALJ concluded that most of Leighty's conditions were not severe. Leighty does not challenge that finding. Her focus is on the ALJ's treatment of the evidence relating to myofascial pain.

restriction" in her activities of daily living. [Id. at 16]. For example, "she testified that she could

take care of her own personal needs but required some help with dressing and washing [and] that

on a good day she would wipe the kitchen counters, load the top rack of the dishwasher, cook,

water her plants and pet her dogs." [Id.]. She also testified that she could drive for short

distances, shop about two times a month in stores with motorized carts, watch television and

read. [Id.]. She could walk for half a block, stand for twenty to thirty minutes, sit for twenty

minutes, and lift as much as three-quarters of a gallon of milk. Although she used a cane to

walk, the device had not been prescribed for her. [ECF No. 6-2 at 19]. [5]

In support of his credibility finding, the ALJ cited the Mental Residual Functional

Capacity Assessment prepared by non-medical state adjudicator, Mary Zelenak, [ECF No. 62 at

24]. Zelenak, did not examine Leighty, but formed her opinion based on records containing

Leighty's statements, her daily activities, the measures taken to relieve her pain, and the type of

medical treatment received she had received. Zelenak, too, concluded that Leighty's subjective

complaints were only partially credible. [Id.].

In determining that Leighty was not disabled, the ALJ relied in part on the testimony of a

vocational expert. Answering a hypothetical question posed by the ALJ, the expert first opined

that a person sharing the claimant's relevant characteristics and impairments would not be able to

_____

5 According to Leighty, she suffered pain in the small of her back, across her hips, down her thighs, and in her calves, ankles, and feet. [ECF No. 6-2 at 52]. The pain in her back was "constant" and the discomfort in her legs was worse when she arose from a sitting position, stood too long, or walked too far. She described her pain as "a deep ache inside of a bone like arthritis or something." [Id.]. She stated that she took a number of narcotics, including morphine, hydrocodone, and M-Oxy. [Id.]. Muscle spasms under her ribcage, made it hard for her to breathe or to sleep. [Id. at 58]. She needed assistance putting her pants on, and with washing and rinsing certain areas. "It's just difficult on the commode." [Id.]. She normally wore only a nightgown at home. Her husband did most of the cooking. [Id.]. She could not vacuum or do the laundry. [Id. at 60]. Activities outside of the home were impossible. On bad days she was in bed between eighteen and twenty hours. [Id. at 63]. She had a Craftmatic bed hat allowed her to change position easily, taking the pressure off of her back and legs. [Id.].

return to her past work as a video clerk or a barmaid, as these jobs required customer attention and a great deal of standing.  [Id. at 67-69].

Based on further questioning of the vocational expert, the ALJ found that "considering the [hypothetical] claimant's age, education, work experience, and residual functional capacity, there were jobs [available] in significant numbers in the national economy that she could have performed."  [Id. at 24].  The expert testified that although Leighty could not perform the full range of light work, this erosion of the unskilled light occupational base would not prevent her from performing jobs such as an inserting machine operator, assembler of electrical accessories, or a photographic machine operator, all jobs existing in significant numbers in the national and regional economies.  [Id. at 70].  At the sedentary level, the hypothetical claimant could work as a plastic design applier, a laminator, or a type copy examiner – again, jobs available in the national and regional economies.  [Id. at 71].

Finally, the ALJ asked the expert to assume that Leighty could not perform work at any exertional level, and that "her ability to maintain sufficient attention, concentration, and pace would be drastically impacted by pain and other distractions.  And in fact the ability to concentrate and maintain a sufficient level of attention for unskilled work would [be] marked, and preclude an eight hour work day, five days a week for forty hours minimum."  [Id. at 72].  The expert confirmed that given these restrictions, no jobs would be available.  [Id.].

Based on the evidence in the record, the ALJ concluded, "[t]he claimant was not under a disability as defined in the Social Security Act, at any time from her July 15, 2003[6] onset date, through June 30, 2007, her last date insured."  [Id. at 15].

_____

6 Again, although the ALJ does not say so here, at the hearing, Leighty's attorney stipulated to an onset date of January 2005.  [ECF 6-2 at 44]

D.  DISCUSSION

The issues raised on appeal are narrow, involving only the ALJ's treatment of Leighty's chronic myofascial pain.  Leighty frames these issues as follows:

1. Given case law establishing that myofascial pain can be disabling even where it is not documented by objective evidence, did the ALJ fail adequately to consider the impact of this condition on Leighty's ability to work?

2. Did the ALJ err when he explicitly and chiefly relied upon negative diagnostic testing to conclude that Leighty's complaints of debilitating myofascial pains were not credible?

3. Did the ALJ err in formulating his residual functional capacity assessment by failing to consider the impact of myofascial pain, and in neglecting to include this impact in the hypothetical question posed to the vocational expert?

The Court considers these allegations of error seriatim.

1.  Leighty's Myofascial Pain and the ALJ's  Emphasis on the Lack of Objective Evidence[7]

Although he concluded that myofascial pain is a condition that could reasonably be expected to produce disabling pain, the ALJ found that Leighty's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not fully credible."  [ECF No. 6-2 at 18].  He looked first to her medical records, concluding that the absence of objective evidence diminished the reliability of Leighty's subjective description of her symptoms.

The compendium of Leighty's medical records begins with those generated in October 2003, when she visited the emergency room at Frick Hospital complaining of pain in her lower back, hips and abdomen.  [ECF No. 6-7 at 91].  She was given IV Morphine and Toradol.  Her family physician, Dr. Tiberio, was consulted by telephone, and agreed that Flexeril should be added to the Vicodin that he had already prescribed.  [Id. at 92].  An MRI of the lumbar spine done on October 13, 2003 was normal. [ECF No. 6-8 at 129].

_____

7 Because these two issues are inextricably intertwined, the Court addresses them together.

In a September 9, 2004 letter to Dr. Tiberio, Dr. Frost, a physician at the Jefferson Pain and Rehabilitation Center, [ECF No. 6-7 at 7], wrote that Leighty had been evaluated on May 20 for pain and muscle spasms in her buttocks that radiated to her lower extremities. She reported "an achy sharp burning pain" with a pain level of nine to ten on a scale of ten. [Id.]. The pain was this severe despite the fact that she had worn a Duragesic patch for three weeks and was taking Lorcet, a narcotic medication. X-rays, bone scans and CT scans were negative. Although the objective medical tests did not reveal the source of Leighty's pain, Dr. Frost stated that he "agree[d] 100% with her medication management and treatment. [Id.]. He also next noted that Leighty's Oswestry score - a patient's evaluation of her low back pain for orthopedic treatment purposes - was "64% which is crippled." [Id. at 8].[8] Leighty placed her current pain level at about six or seven on a scale of ten, stating that it had averaged a seven in in the past month. At times, though, it had been as high as ten. She expressed concern that she would lose her job as she "ha[d] major difficulty with lifting a heavy bag of groceries, lifting a heavy weight, bending and lifting from the floor to waist. She also ha[d] trouble lifting above the shoulder, pushing and pulling and opening jars. She has difficulty sweeping, vacuuming, climbing ladders and kneeling." [Id.].

According to Dr. Frost, Leighty had been under Dr. Tiberio's care, and though she had received appropriate treatment, she still complained of muscle spasms, which were evident along the right SI joint. [Id. at 9]. He was puzzled by the cause of her discomfort. All tests were normal with the exception of those indicative of pelvic ring instability. [Id.]. Dr. Frost's report concluded with the following diagnosis: "This lady has Lumbalgia and lumbago bilaterally [on the right and left]. She could have pseudo sciatica . . . or she could have underlying actual

---

8 For an abstract describing the Oswestry Index, its design, objectives, results, and conclusions, see http//www.ncbi.nim.nih.gov/pubmed/11074683.

electrical sciatica – will need an EMG/NCS.  She has chronic pain and anxiety with a SI dysfunction."  [Id].  She agreed to injections in the SI joints, and Roxicodone was added to her medication regimen.  Home application of heat and massage were recommended, and she was directed to return in a month.  [Id. at 3].

Dr. Frost saw Leighty again in July 2004. [ECF No. 6-7 at 6].  At that time, she rated her pain a four plus on a scale of ten, and was said to be making good progress under the diagnosis of lumbago, sciatica, myalgia (muscle pain or aching), and myositis (muscle inflammation).  She was again given trigger point injections.  In August 2004, Leighty rated her pain at 7.5 and was prescribed additional narcotics.  [Id. at 5].  A month later, Dr. Frost wrote that Leighty "ha[d] an increase in the intensity and frequency of her [pain]."  [Id. at 2].  Her chief complaint was bilateral low back, hip, and leg pain, with the right leg more painful than the left, and tenderness in the right SI joint.  The doctor noted that Leighty was "making good progress with current conservative measures."  [Id.].  She was given injection therapy, and a renewed prescription for Roxicodone and Duragesic Patches.  Hydrocodone was added to her drug regimen, and she was instructed to return in a month.

During a gynecological examination in January 2005, Leighty exhibited paraspinal muscle tenderness on palpation.  [Id. at 13].  At the end of that month, Leighty reported to the emergency room at Frick Hospital in Mt. Pleasant, Pennsylvania, complaining of unbearable back pain "affect[ing] all aspects of her living."  [Id. at 29].  Administration of Phenergan and Dilaudid relieved her pain temporarily, but when the effect of these drugs wore off, she stated that her pain was so severe that she could not go home.  She was admitted overnight for pain control.

The genesis of her chronic back pain "remained elusive." [Id. at 20]. She was advised to continue narcotic medications, prescribed morphine, and referred to a pain clinic. Her medical management team noted that though Leighty complained of inadequate pain control, she was able to walk to the cafeteria to smoke. Physical and occupational consults were ordered. [Id. at 22].

In early February, the claimant visited a pain specialist, complaining of back pain radiating to her groin. She did not appear to be in distress. Examinations were normal, although Leighty walked with a limp in order to relieve her pain. [Id. at 126]. On February 10, she received an epidural injection. [Id.]. Later the same month, Leighty consulted a psychiatrist, and was placed on an antidepressant. It was planned that she would return after a full medical work up. An EMG test done in February 2005 was normal. [Id. at 15]. Minimal degenerative changes in the lumbar spine, particularly in the L4-5 disc space were noted. [Id. at 19]. A CT scan was negative. She had tenderness over the lumbosacral spine and over her right buttock, and demonstrated weakness in the right quadriceps with sensation deficit "involving the lateral aspect of the thigh and the anterior medial aspect of the shin." [Id. at 27].

Dr. Spiro saw Leighty in the Department of Neurological Surgery at UPMC on February 22, 2005. [ECF No. 6-7 at 99]. He recorded her complaints of low back pain for three to four years, noting that "[s]he has had multiple episodes of lumbar spasm provoking hospital admissions. She is now on a high dose of narcotic pain medicine . . . She says that she occasionally gets some pain into her groin but no distinct leg pain." [Id.]. Her medications included Flexaril, MS Contin, hydrocodone, and fentanyl lollipops. Though she had a normal MRI she had "significant paraspinal muscle tenderness." [Id.]. Dr. Spiro attributed her pain to "muscular injuries in her lumbar spine," and recommended that she undergo physical therapy.

[Id.].  The only abnormal finding was tenderness in the paraspinal muscles.  She was diagnosed with Lumbar sprain/strain- chronic controlled and Lumbar IDD-Status: chronic uncontrolled. [Id. at 120].

On April 1, 2005, Leighty kept an appointment with Dr. Navalgund, a pain management specialist.  She described low back pain and thoracic muscle tightening.  "I wake up in the morning with excruciating pain in the right leg.  It is very numb.  Ever since Dr. Frost put the shot in the right hip."  [Id. at 117].  She received another spinal injection a few days later.

On May 31, 2005, she again saw Dr. Navalgund, rating her pain at level six.  "She was [v]ery dramatic with her pain complaints."  [ECF No. 6-9 at 31].  She asked to try Dilaudid instead of hydrocodone, stating that the latter gave her GI problems.  She requested a refill of the fentanyl lollipops.  Leighty complained of difficulty with activities, including climbing stairs, walking, sitting, standing and lifting, and described back and lumbar pain.  [Id. at 32]. The doctor found tenderness in the paraspinal muscles and motor- give way with testing hip flexors.  All other findings were within normal limits.  Leighty was diagnosed with myofascial pain/Myalgia/Myositis – status controlled.  [Id. at 33].

On July 1, 2005, Leighty complained to Dr. Navalgund of constant and progressive aching in her back and hips.  [ECF No. 6-9 at 27].  She was "tearful and anxious with increased pain," stating that she had tried different doses of Dilaudid, which had worked initially, but no longer gave her adequate relief.  [Id.].  She also had prescriptions for morphine sulfate, hydrocodone, and fentanyl lollipops.  [Id.].  She again complained of difficulty walking, climbing stairs, sitting, standing, and lifting.  Her diagnosis was unchanged.

In August 2005, the claimant told Dr. Navalgund that she had lost her job, because she could not stand very long or lift. She had fallen out of bed. [Id. at 27]. Her last epidural had helped until she fell. Her limitations and diagnosis were unchanged.

In November 2005, Leighty's mother-in-law told Dr. Navalgund that when she visited Leighty, Leighty seemed to be dazed and very groggy. Leighty was told to reduce her intake of Flexeril. She had fallen down fourteen steps in mid-October. [Id. ]. She was doing well on her combination of pain medicines. The doctor told her that although the pain would never be eliminated, the goal was to reduce it by half, and Leighty was happy that this goal had been reached. [Id. at 19]. Her diagnosis was unchanged, and she was given permission to try acupuncture.

In December 2005, Leighty saw Dr. Navalgund's physician's assistant, telling her that she needed to have her medicines changed because of increased pain. [Id. at 13]. When she saw Dr. Navalgund the next month, Leighty reported that her pain had been up and down in the past month and that "[t]his has been very bad." Her pain had progressively worsened and was "horrible." [Id. at 5]. She couldn't stand long, and was taking four to six hydrocodone tablets per day. Her prescription for this drug was increased because, since she was not a cancer patient, her insurance company would no longer approve the fentanyl lollipops. [Id. at 17].

In February 2006, claimant saw Dr. Dayo instead of Dr. Navalgund. She reported a pain level of 4-5, telling him that her discomfort had worsened. At the time of her visit, Leighty was taking hydrocodone, and morphine. She asked if she could have the fentanyl lollipops again, because they offered more effective pain relief than the hydrocodone. Again, the insurance company refused her request. [Id.]. She denied having recent muscle cramps or spasms, but complained of back and bilateral leg pain. [Id. at 6]. There was tenderness in her paraspinal

muscles and give-way weakness with testing in her hip flexors.  [Id. at 8].  A discogram was

scheduled and additional narcotics were prescribed.  [Id.].

In June 2006, Dr. DeTore, a state psychologist, performed a psychological evaluation of

the claimant.  Among other things, Leighty reported that she was only able to drive short

distances because her pain medication made her sleepy.  [ECF No. 6-8 at 133].  She stated that

she suffered from chronic pain in her lower back and buttocks that radiated down her legs.  She

had seen doctors at several pain clinics, but things had not improved.  [Id. at 134.].  Her records

indicated that she had seen twelve different doctors, and had taken various medications, been

given injections, and had had chiropractic care, all without significant impact on her pain.  [Id.].

She had developed depression over the past nine months, and her activities were very restricted.

"Regarding daily living skills, she is obviously very limited physically . . . , but her depression

and lack of motivation also contribute to disinterest, withdrawal and isolation."  [Id.].  Dr.

DeTore concluded that Leighty seemed to be "unable to perform tasks associated with her former

employment [and] would appear to have significant problems with focus and concentration, and

consistently carrying out task duties."  [Id. at 137].

In August 2006, a psychologist, Dr. Santilli, performed a mental residual functional

capacity evaluation based on evidence in the file.  [ECF No. 69 at 69].  She concluded that

Leighty was capable of meeting the demands of competitive work, and that the functional

limitations noted by Dr. DeTore were overstated.  [Id. at 71].  Dr. Santilli did not address

Leighty's alleged pain or the medical records relevant to that pain.

In November 2006, Leighty was evaluated by Dr. Navalgund.  She reported continuous

aching, and rated her pain an eight.  Her back muscles were tender, and she was taking Oxy IR

and Hydrocodone for the pain.  [ECF 6-10 at 29].

On January 16, 2007, when Leighty was examined by Dr. Navalgund, she described constant cramping and aching, tenderness, and increasing muscle spasms. [ECF No. 6-10 at 23]. She rated her pain a six on a scale of ten, and stated that it was radiating to her buttocks, her bilateral hips and her midcalf on the left. She was taking two tablets of Oxy IR every six hours, Hydrocodone five or six times per day, and was also taking Morphine Sulfate and Flexeril. [Id. at 24].

Leighty underwent a discogram on July 10, 2007, which was positive at L4-5. She was diagnosed with lumbar intervertebral disc disorder. [ECF No. 6-10 at 62]. She was seen at the at the pain management center in August 2006 where she described pain in the low back into the hips and stated that she sleeps better if she sits up. [ECF No. 6-10 at 36]. At the time, she was taking hydrocodone, morphine, and Oxy IR. [Id.]. Tenderness was noted in her lumbosacral spine. [Id. at 39].

On August 9, 2007, Leighty was examined by Dr. Michael Catino, Medical Director of the Westmoreland Regional Hospital Spine Center. He diagnosed her with chronic myofascial back pain, but concluded that surgery would be of no benefit. Nerve conduction values in a test conducted on July 2, 2007 were normal. [ECF 6-10 at 60].

The relevant medical records end here.

Pursuant to the Social Security Regulations, evaluation of a claimant's symptoms, including pain, is a two-step process. First, the ALJ must assess the medical evidence in order to determine whether that evidence includes medical signs and laboratory findings which show that the claimant has a medical impairment which could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). As the Court has already noted, the ALJ found that myofascial pain meets that standard. Under the regulations, the ALJ was next required to

evaluate the intensity, persistence and limiting effects of the claimant's symptoms to determine the extent to which they impeded her ability to do basic work activities. 20 C.F.R. § 404.1529(c)(1).

The ALJ's second step analysis is anomalous in that it virtually ignores what is supposed to be the primary focus - Leighty's complaints of debilitating pain. This disregard of Claimant's primary condition is particularly apparent in the ALJ's discussion of 20 CFR § 404.1529(c), which reads:

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you and your treating or non-treating source or other persons report, which can reasonably be accepted as as consistent with the objective medical evidence and other evidence will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> i. Your daily activities;
>
> ii. The location, duration, frequency, and intensity of your pain or other symptoms;
>
> iii. Precipitating and aggravating factors;
>
> iv. The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> v. Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> vi. Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
>
> vii. Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

There is no doubt that these records demonstrate that Claimant's primary care physician, the other treating physicians – many of them pain specialists - who saw Leighty on a regular

basis over an extended period, emergency room physicians, and Dr. DeTore, the holder of a

Doctor of Education Degree in Psychology, believed that Leighty suffered from and treated her

aggressively for unremitting serious pain.  Despite this fact, the ALJ skims over this treatment

history.  He wrote:

> Given the lack of an objective basis for her complaints for disabling
> limitations, the undersigned concludes that the claimant has
> exaggerated the nature and extent of her impairments.  [She] has not
> generally received the type of medical treatment one would expect
> for a totally disabled individual.  Given the claimant's allegations
> of totally disabling symptoms, one might expect to see some
> indications in the treatment records of restrictions placed on the
> claimant by the treating doctor.  In addition, no doctor has expressed
> the opinion that the claimant is unable to work.

[ECF No. 6-2 at 23)].  What the ALJ has neglected to note is that none of Leighty's treating

physicians expressed any doubt whatever that Leighty's pain was real.  They ordered test after

test to determine the origin of the pain, and used a wide range of strong medications to try to

control it. Leighty was given an array of narcotics in significant doses for the entire period

covered by the medical records.  She was regularly evaluated by pain specialists who gave her

repeated spinal injections – an intervention that certainly would not have been prescribed had

these physicians failed to credit Leighty's allegations of pain.  She was offered – but refused – an

intrathecal morphine pump.  Doctors sent her for physical therapy.  They admitted her to the

hospital through the emergency room in an effort to control her pain.  They did not attempt to

dissuade her from trying acupuncture.  Treatment notes routinely reflect that Leighty exhibited

paraspinal tenderness.  Not once in these notes was Leighty accused of malingering or of

exhibiting drug seeking behavior,  nor was she questioned concerning why she was not working,

or encouraged to attempt to return to work.  She insists that her restrictions were already so

severe, that there was no point in imposing others.

The ALJ gives short shrift to the extensive medical records documenting Leighty's chronic pain. Instead, he writes: "Given the lack of an objective basis for her complaints for disabling functional limitations, the undersigned concludes that the claimant has exaggerated the nature and extent of her impairments." [Id.].

In further support of his conclusion, the ALJ relied on an August 26, 2006 physical residual functional capacity assessment prepared by non-examining non-medical state adjudicator, Mary Diane Zelenak [ECF No. 6-9 at 62], who found that Leighty could perform work at a light exertional level. Zelenak's report, however, did not focus on the severity of Leighty's myofascial pain. She assessed the record as it pertained to lumbar disc disease, diverticulitis, and gastroesophageal reflux disease, concluding that objective evidence documenting these conditions was lacking. [ECF No. 6-9 at 67-8]. She addressed Leighty's allegations of pain dismissively in the last full paragraph of her report, stating that Leighty suffered daily pain that disturbed her sleep. "The claimant had had physical therapy, chiropractic care, and had "gone to a pain management clinic." [Id. at 68]. She further minimized Leighty's pain when she wrote that Leighty was able to cook, walk without assistance, use a television remote, and a touch-tone telephone.[9] She also observed that "[t]he treatment for Leighty's disc disease has been essentially routine and conservative in nature." [Id.]. The ALJ found that Zelenak's findings were reasonable, never specifically addressing the type of pain involved, or the measures undertaken by nearly every physician whose reports are included in the record.

The ALJ next considered the claimant's description of her daily activities, terming them "fairly limited." [Id.]. He found, however, that the narrow range of Leighty's activities did not constitute "strong evidence in favor of finding [her disabled]." [Id.]. First, these "allegedly

---

9 The Court feels compelled to note that back pain would have to be exquisite indeed in order to preclude a claimant's use of a television remote or a touch tone telephone.

limited daily activities [could not] be objectively verified with any reasonable degree of certainty. [10]  Secondly, even if [they] were as limited as Leighty alleged, it would be difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons in view of the *relatively weak medical evidence* and *other factors . . . .*" [Id. at 24] (emphasis added).  These other factors were that "the claimant had worked only sporadically [11] prior to the alleged disability onset date and her earnings were never . . . indicative of substantial gainful activity." [Id.].  This, said the ALJ, "raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments." [Id.].  The ALJ does not suggest what else might have prevented the claimant from working.

The ALJ also ignored the fact that Leighty had purchased a Craftmatic bed in order to alleviate the pressure on her back and legs, and that she had been directed to apply moist head to the areas in which she experienced pain.

Overall, the ALJ's analysis of Leighty's pain is riven with problems.  In so saying, the Court is well aware that "[c]redibility determinations are peculiarly the province of the finder of fact," and that the Court is not to upset such findings where they are supported by substantial evidence.  Diaz v. Sec. Health & Hum. Serv., 898 F.2d 774, 777 (10th Cir.1990).  "In most cases, a district court will give great deference to the ALJ's credibility determination because he or she is best equipped to judge the claimant's demeanor and attitude.  See Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  Such deference is due, however only where it is clear that the credibility determination is "closely and affirmatively linked to substantial evidence and not just

_____

10 This unhelpful observation would apply to virtually anyone seeking benefits under the Act.  A person's description of her daily activities is rarely corroborated, and nothing in the Act, the regulations, or the case law imposes a corroboration requirement.

11 The record shows that Leighty worked as a bartender for five hours per day, two days per week, for fourteen consecutive years, ending with the onset of her disability.  [ECF No. 6-6 at 8].

a conclusion in the guise of findings." <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1173 (10th Cir. 2005).

On this record, the court is unable to determine how the ALJ arrived at his conclusion regarding Leighty's credibility.  There is no evidence that her treating or examining physicians questioned her claims regarding the duration, intensity and effects of her pain.  The ALJ seems to place primary reliance on the conclusions of a non-examining non-medical adjudicator, whose findings contradict the bulk of the evidence in the medical records.  This is particularly problematic in view of the fact that the governing regulations specify the manner in which the opinions of various sources are to be evaluated.  <u>See</u> <u>Adorno v. Shalala</u>, 40 F.3d 43, 47-48 (3d Cir. 1994) ("greater weight should be given to the findings of a treating physician than to a consultant" and the least weight to opinions of non-examining physicians.).  This does not, however, mean that a treating physician's opinion is unassailable.  The regulations make clear that there are factors which may favor rejecting or diminishing the weight given to that opinion.

The ALJ is authorized to consider the nature and extent of the treatment history, 20 C.F.R. § 404.1527(d)(2)(ii), the extent to which the opinion is explained and supported by other evidence in the record, 20 C.F.R. § 404.1527(d)(3), whether the opinion is consistent with the entire record, 20 C.F.R. § 404.1527(d)(4), and the extent of the source's familiarity with the other record evidence.  "Although an ALJ may accept some parts of the medical evidence and reject others, he must consider all the evidence and give cogent reasons for discounting any evidence, particularly when he rejects evidence that suggests a contrary disposition." <u>Smith v. Astrue</u>, Civ. Act. No. 11178 , 2011 WL 1790055 (E.D. Pa. May 10, 1022) (citing <u>Adorno</u>, 40 F.3d at 48).

The United States Court of Appeals for the Third Circuit has stressed that "the special nature of proceedings for disability benefits dictates extra care on the part of the agency in developing an administrative record and in explicitly weighing all evidence." Doborwshy v. Califano, 606 F.2d 403, 406 (3d Cir. 1979). "Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight [he] has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec. of HEW, 567 F.2d 258, 259 (4th Cir. 1977)).

The ALJ's use of boilerplate language stating that he has given "careful consideration [to] the entire record" is insufficient to constitute adequate development of the administrative record. Greene v. Barnhart, 2006 WL 1791264 at *6 n.8 (E.D. Pa. June 26, 2006). Here the "ALJ [appears to have simply ignored] the opinion of . . . competent, informed, treating physician[s]." Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986). In finding that Leighty was not disabled, the ALJ relied primarily on the negative results of clinical testing, such as MRIs and CT scans, where such negative results are characteristic of the condition alleged. He did not, however, discuss the "numerous clinical examinations during which [Leighty's treating physicians] repeatedly identified tenderness upon palpation and/or muscle spasm." Soto v. Astrue, Civ. Act. No. 08-4701, 2009 WL 2327402 at *9 (E.D. Pa. 2009). He gave no consideration at all to the evidence that Plaintiff's pain would interfere with his inability to work. Thus, the ALJ improperly concluded that Plaintiff was not disabled without considering all the relevant facts; the decision was not, therefore, supported by substantial evidence.

2. The Questions Posed to the Vocational Expert

The United States Court of Appeals for the Third Circuit has held, with respect to hypothetical questions posed to vocational experts, that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984). A hypothetical question "must reflect all of a claimant's impairments." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.1987). The questions posed to and the answers given by the vocational expert in this matter did not include any reference to regarding Leighty's pain or its effects on her ability to work. In Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit stated that "[w]here there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." (citations omitted).

III. **CONCLUSION**

Where, as here, a determination is made that the decision of the ALJ does not rest on substantial evidence, the Court is authorized, pursuant to 42 U.S.C. § 405(g), to modify or reverse the Commissioner's decision with or without remanding the matter to the Commissioner for rehearing. The Court finds that remand would serve little purpose here, given that the "administrative record . . . has been fully developed and . . . substantial evidence on the record as a whole indicates that the [claimant] is disabled and entitled to benefits." Rieder v. Apfel, 115 F. Supp.2d 496, 506 (M.D. Pa 2000) (citing Gilliland 786 F.2d at 178). "When faced with such cases, it is unreasonable for the court to give the ALJ another opportunity to consider the

evidence because additional administrative proceedings would only result in further delay in the receipt of benefits." Id. (citing Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980).

Having devoted detailed attention to the record, the Court finds that the ALJ failed to address the compendium of medical evidence supporting Leighty's account of her symptoms and their effects, and did not articulate any reason for failing to do so. He also failed adequately to address the factors set out in in 20 CFR § 404.1529(c), which must be considered in evaluating subjective complaints of pain. Finally, he failed to include any aspect of Leighty's pain in the hypothetical questions posed to the vocational expert. The Court finds that this is a case in which it is appropriate that discretion be exercised in favor of reversing the decision of the Commissioner, rather than remanding the matter for additional proceedings. See Tennant v. Schweiker, 682 F.2d 707, 710 (8th Cir. 1982).

The Court thus recommends that Leighty's Motion for Summary Judgment be granted, that the Commissioner's Motion for Summary Judgment be denied; and the matter be remanded to the Commissioner for the sole purpose of calculating the benefits to which Leighty is entitled.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.

                                        Respectfully submitted,

                                        /s/ Maureen P. Kelly
                                        United States Magistrate Judge

Dated: October 3, 2011

cc: Counsel of Record via CM-ECF